# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA, and THE STATE OF WISCONSIN, ex rel. DR. TOBY TYLER WATSON,<br><br>                    Plaintiffs,<br><br>v.<br><br>JENNIFER KING-VASSEL,<br>CAPS CHILD & ADOLESCENT PSYCHOLOGICAL SERVICES, and ENCOMPASS EFFECTIVE MENTAL HEALTH SERVICES, INC.,<br><br>                    Defendants. | Case No. 11-CV-236-JPS<br><br><br><br>**ORDER** |

This *qui tam* action was initially filed by the relator, Dr. Toby Watson, on March 3, 2011. (Docket #1). The complaint alleges that defendant Dr. Jennifer King-Vassel violated the Federal False Claims Act and Wisconsin False Claims Law by prescribing medications to a minor patient receiving Medicaid assistance for reasons that are not medically-accepted. (Compl. ¶¶ 1, 26–29). The complaint also alleged that CAPS Child & Adolescent Psychological Services (CAPS) and Encompass Effective Mental Health Services (Encompass) employed Dr. King-Vassel and were, therefore, liable under a theory of *respondeat superior*. (Compl. ¶¶ 30–33). At the time of filing, this matter was sealed while the United States and the State of Wisconsin determined whether to intervene in the matter; after they declined to do so, the Court unsealed the matter, and summons were issued to the defendants. (Docket #4, #9, #10, #11, #12). The parties appeared before the Court on February 15, 2012, after which time the Court scheduled relevant trial and

discovery dates. (Docket #21, #22, #24). After completing much of the discovery process, Dr. King-Vassel and CAPS jointly moved for summary judgment on July 16, 2012; Encompass joined in that motion and filed a separate brief on July 19, 2012. (Docket #28, #29, #33, #35). That motion is now fully briefed, and the Court takes it up along with other procedural matters that remain outstanding. (Docket #32, #38, #40, #42, #45, #47, #49, #50, #51, #52, #54, #55, #56, #57).

## 1. BACKGROUND

The factual background of this case is fairly straightforward, and the parties do not dispute the core facts. The case's history, on the other hand, is very detailed, and includes a multitude of motions and briefs filed by the parties. Therefore, the Court will discuss those two bodies of facts separately—it will first address the factual background of the case before detailing the case history.

### 1.1 Factual Background

The relator, Dr. Watson, secured the cooperation of N.B. in bringing this suit after meeting an attorney through the International Society for Ethical Psychology and Psychiatry, and doing further research into bringing a *qui tam* claim through the website PsychRights.org. (King-Vassel/CAPS PFF ¶¶ 3–4). After researching *qui tam* false claims actions, Dr. Watson placed an ad in a Sheboygan newspaper soliciting minor Medicaid patients who had received certain medications. (King-Vassel/CAPS PFF ¶ 5). N.B.'s mother

Case 2:11-cv-00236-JPS   Filed 10/23/12   Page 2 of 22   Document 59

responded to the advertisement, and Dr. Watson obtained N.B.'s medical records through a medical release.[1] (King-Vassel/CAPS PFF ¶¶ 11–14).

Thereafter, based on those records, Dr. Watson filed this *qui tam* action alleging that defendant Dr. King-Vassel prescribed psychotropic drugs to N.B., a minor Medical Assistance recipient, from 2004 until 2008. (King-Vassel/CAPS PFF ¶¶ 1–2; Encompass PFF ¶ 3). Dr. Watson alleges that those prescriptions were not for indications approved by the Food and Drug Administration (FDA) or otherwise supported by applicable sources, and that therefore the prescriptions were false claims when made to Medicaid for reimbursement and further that Dr. King-Vassel is responsible for the filing of those false claims. (King-Vassel/CAPS PFF ¶ 2; Encompass PFF ¶ 3).

During the relevant time period, Dr. King-Vassel worked in conjunction with both CAPS and Encompass, and therefore Dr. Watson filed *respondeat superior* claims against both CAPS and Encompass, alleging that those parties employed Dr. King-Vassel. (King-Vassel/CAPS PFF ¶ 21; Encompass PFF ¶ 5–47).

### 1.2 Case History

After this case was filed, the United States and State of Wisconsin declined to intervene. (Docket #8, #13). Thereafter, the Court set a trial schedule and discovery began. (Docket #21, #22, #24).

---

[1]Dr. Watson obtained these records through what might be described as a borderline-fraudulent medical release. (*See* King-Vassel/CAPS PFF ¶¶ 11–12). The release stated that the information to be released was for the "purpose of providing psychological services and for no other purpose what so ever." (King-Vassel/CAPS PFF ¶¶ 11–12). Dr. Watson never used those records in the treatment of N.B., and in reality obtained them only to bring the immediate suit. (King-Vassel/CAPS PFF ¶¶ 13–14). Notwithstanding the highly questionable–indeed unethical–manner in which the release was obtained, the fact is not ultimately relevant to the motion for summary judgment currently under consideration.

Case 2:11-cv-00236-JPS   Filed 10/23/12   Page 3 of 22   Document 59

After several months of discovery, CAPS and Dr. King-Vassel filed a joint motion for summary judgment. (Docket #28).[2] Encompass joined that motion and filed a separate brief, specifically addressing Encompass' role in this case, and arguing that *respondeat superior* could not apply to Encompass. (Docket #33).

While the summary judgment motion was pending, however, it apparently became clear to Dr. Watson that Dr. King-Vassel was not an employee of either CAPS or Encompass, and therefore those parties could not be held liable under a *respondeat superior* claim. (Docket #40, #49, #50). Accordingly, Dr. Watson filed a motion to dismiss Encompass on August 12, 2012 (Docket #40), and later filed an amended motion to dismiss Encompass (Docket #49) and an additional motion to dismiss CAPS (Docket #50).

The motion to dismiss Encompass apparently was not made quickly enough, though, and on August 29, 2012, Encompass filed a motion for sanctions against Dr. Watson for his failure to dismiss Encompass earlier in the litigation process. (Docket #51).

That motion for sanctions is still outstanding, as is the motion for summary judgment. However, because the Court will grant Dr. Watson's motions to dismiss both Encompass and CAPS (Docket #49, #50), the Court need only address the summary judgment motion as it pertains to Dr. King-Vassel.

_____

[2]One day after filing their motion for summary judgment, CAPS and Dr. King-Vassel filed a motion to stay the Court's scheduling order pending resolution of the summary judgment motion. (Docket #32). Dr. Watson never filed a response to the motion to stay, and the Court has not yet acted upon that motion. Because the Court grants summary judgment as to Dr. King-Vassel, below, that motion is now moot and the Court will deny it as such. (Docket #32).

Case 2:11-cv-00236-JPS   Filed 10/23/12   Page 4 of 22   Document 59

The Court addresses the substance of both the motion for summary judgment and the motion for sanctions, below.

## 2. DISCUSSION

The Court must address two separate substantive issues: first, whether Dr. King-Vassel is entitled to summary judgment as to Dr. Watson's claims against her; and, second, whether Encompass is entitled to sanctions against Dr. Watson.

### 2.1 Summary Judgment

As mentioned above, the Court will dismiss defendants CAPS and Encompass, pursuant to Dr. Watson's motion. (Docket #49, #50).

Therefore, the outstanding summary judgment motion must be decided only insofar as it effects Dr. King-Vassel. (Docket #28). The Court turns to that issue now, and determines that Dr. King-Vassel is not entitled to summary judgment.

#### 2.1.1 Summary Judgment Standard

The Court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The Court must construe all facts in a light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). Nonetheless, the nonmoving party must present "definite, competent evidence to rebut" the summary judgment motion in order to successfully oppose it. *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

Case 2:11-cv-00236-JPS   Filed 10/23/12   Page 5 of 22   Document 59

The purpose of the summary judgment motion is to determine "whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### 2.1.2 Substantive Analysis

Dr. King-Vassel has raised two primary arguments for summary judgment. First, she argues that this action is jurisdictionally barred by 31 U.S.C. § 3730(e)(4). (King-Vassel/CAPS Br. in Supp. 5–15). And, second, she alleges that Dr. Watson failed to name any expert to establish that the relevant medications were prescribed for off-label uses or that the claims for those medications were ever officially submitted and payments received therefor. (King-Vassel/CAPS Br. in Supp. 15).

### 2.1.2.1 Jurisdictional Bar

The False Claims Act (FCA) prohibits false or fraudulent claims for payments to the United States. 31 U.S.C. § 3729(a). In order to remedy such fraud, the FCA allows private individuals to bring *qui tam* actions in the government's name against violators. 31 U.S.C. § 3720(b)). If the *qui tam* action is successful, then the relator of the action is entitled to receive a share of any proceeds in addition to attorney's fees and costs. 31 U.S.C. §§ 3730(d)(1)–(2)).

However, there are jurisdictional limits on the abilities of private individuals to bring suit. *See, e.g.*, 31 U.S.C. § 3730(e)(4); *United States v. Bank of Farmington*, 166 F.3d 853, 888 (7th Cir. 1999); *Graham County Soil and Water Conservation District v. United States ex rel. Wilson*, 130 S.Ct. 1396, 1407 (2010).

At specific issue here is one of those jurisdictional limits: the "public disclosure" bar. 31 U.S.C. § 3730(e)(4). Under that bar, the Court "shall dismiss" any claim based on allegations that had previously been publicly

Case 2:11-cv-00236-JPS   Filed 10/23/12   Page 6 of 22   Document 59

disclosed in: (1) Federal hearings in which the Government is a party; (2) Federal reports hearings, audits, or investigations; or (3) news media reports. 31 U.S.C. § 3730(e)(4)(a). However, even if there is a public disclosure upon which a *qui tam* action is based, the Court may still hear the action if the relator is an "original source" of the information in the *qui tam* complaint and either brought the suit before public disclosure or has independent knowledge that materially adds to the public disclosure. 31 U.S.C. § 3730(e)(4)(B). As the Seventh Circuit stated the rule in *United States ex rel. Baltazar v. Warden*, this inquiry is a three-prong analysis:

> ***first***, the Court must determine whether there has been a public disclosure of the allegations in the *qui tam* complaint—and if there has not been a public disclosure, then 31 U.S.C. § 3730(e)(4) does not bar the suit;

> *then,* ***second***, the Court must determine whether the suit at hand is based upon that public disclosure—and if the suit at hand is not based on such disclosure, then 31 U.S.C. § 3730(e)(4) does not bar the suit;

> *finally,* ***third***, the Court must determine whether the relator is an original source of the information upon which the suit is based—and if the relator is an original source, then 31 U.S.C. § 3730(e)(4) does not bar the suit.

*United States ex rel. Baltazar v. Warden*, 635 F.3d 866, 867 (7th Cir. 2011) (citing 31 U.S.C. § 3730(e)(4).

Importantly—and perhaps lost on counsel for Dr. King-Vassel—if the relator, Dr. Watson, prevails on *any* of those three questions, then his suit is not barred by 31 U.S.C. § 3730(e)(4). *Baltazar*, 635 F.3d at 867.

Here, there has not been public disclosure of the relevant facts and, therefore, 31 U.S.C. § 3730(e)(4) does not bar Dr. Watson's suit. A public disclosure has occurred only when "the critical elements exposing the transaction as fraudulent are placed in the public domain." *United States ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 495 (7th Cir. 2003) (citing *United States ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509, 1512 (8th Cir. 1994); *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994)). Even when there have been public reports of rampant fraud—such as information showing fraud by half of all chiropractors—there has not been public disclosure. *Baltazar*, 635 F.3d at 867–68. Such a "very high level of generality" cannot establish public disclosure. *U.S. ex rel. Goldberg v. Rush University Medical Center*, 680 F.3d 933, 935 (7th Cir. 2012). The important fact in *Baltazar* was that there had been no public disclosure of "a *particular* fraud by a *particular* chiropractor." *Id.* (citing *Baltazar*, 635 F.3d at 867–68). Rather, because the news accounts that formed the alleged public disclosures lacked particulars, they could not be used as the basis of litigation, and therefore did not trigger the public disclosure bar; quite to the contrary, in fact, the relator in *Baltazar* provided detailed and particular information not otherwise available to the government that enabled the government to seek reimbursement—the very goal of allowing *qui tam* actions. *See Baltazar*, 635 F.3d at 867–68; *Goldberg*, 680 F.3d at 935.

The situation in the case at hand is almost precisely analogous to that in *Baltazar*. Here, Dr. Watson has provided particular information relating to Dr. King-Vassel that was previously unknown to the government. Nonetheless, Dr. King-Vassel argues that there has been public disclosure as a result of previous news accounts of Medicaid fraud and similar lawsuits

throughout the nation. (*See* King-Vassel/CAPS Br. in Supp. 10–15). But, just as in *Baltazar*, none of those news accounts or lawsuits touched upon the *particular* facts of this case—they did not deal particularly with Dr. King-Vassel, with the places at which she practiced, or even with the geographic area in which she practiced. As such, exactly as was the case in *Baltazar*, the alleged public disclosures could not have formed the basis of this lawsuit, and, therefore, lack the particulars that the Court must look for to find the public disclosure bar triggered. *See Baltazar*, 635 F.3d 867–68. Had Dr. Watson not brought this suit, the government would not be aware of Dr. King-Vassel's alleged fraud (despite any highly generalized awareness of ongoing Medicaid fraud by doctors prescribing medications to minors for off-label uses)—thus, just as in *Baltazar*, this *qui tam* action serves the precise purpose for which such actions were intended. *Id.* As such, the Court must determine that there has not been a public disclosure of the allegations in this action.

Having determined that there has not been a public disclosure of the allegations in Dr. Watson's complaint, the Court is obliged to conclude that his action is not barred by 31 U.S.C. § 3730(e)(4). *See, e.g.*, *Goldberg*, 680 F.3d at 935, *Baltazar*, 635 F.3d at 867, *Feingold,* 324 F.3d at 495. As stated above, the mere fact that Dr. Watson's complaint satisfied a single one of the three prongs of analysis under 31 U.S.C. § 3730(e)(4) is enough to overcome that bar. Thus, though it is very possible that the Court would conclude that the

Case 2:11-cv-00236-JPS   Filed 10/23/12   Page 9 of 22   Document 59

other two prongs were not satisfied,[3] the Court does not need to engage in that analysis. *Baltazar*, 635 F.3d at 867.

Dr. Watson's *qui tam* action is not barred by 31 U.S.C. § 3730(e)(4).

### 2.1.2.2 Failure to Name Expert Witness

Dr. King-Vassel's only other argument for summary judgment centers around Dr. Watson's failure to name an expert witness to testify. (King-Vassel/CAPS Br. in Supp. 15). On this point, Dr. King-Vassel argues that Dr. Watson cannot establish Medicaid fraud without an expert to provide details on two broad areas of fact: (1) the processing of Medicaid reimbursements and whether Dr. King-Vassel received such reimbursement; and (2) the off-label nature of the prescriptions made by Dr. King-Vassel to N.B. (King-Vassel/CAPS Br. in Supp. 15; King-Vassel/CAPS Reply 10–13). This is a confusing way of arguing that Dr. Watson has not made the requisite showing to establish an actual Medicaid fraud.

To prevail in a false claims action, a relator must establish that the defendant "*knowingly* presents, or *causes to be presented*, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A) (emphasis added).

---

[3]Dr. King-Vassel's brief extensively addresses the issue of whether Dr. Watson is an "original source" of information in his complaint, with "direct and independent knowledge of the information on which the allegations are based." (*See* King-Vassel/CAPS Br. in Supp. 5–10 (citing 31 U.S.C. § 3730(e)(4)(B); King-Vassel/CAPS Reply 5–6). And, while the Court agrees that there may be some question as to whether Dr. Watson is a direct source, that inquiry is wholly irrelevant to the Court's analysis. As the Court has mentioned throughout this Order, the public disclosure bar inquiry consists of three sequentially-posed prongs, the satisfaction of any one of which is sufficient to overcome the bar. In fact, courts do not reach the original source issue unless they first determine that the first two prongs are not satisfied. Thus, despite Dr. King-Vassel's extensive arguments to the contrary, the Court need not address the original source issue, because that issue is entirely irrelevant to the final analysis.

Case 2:11-cv-00236-JPS   Filed 10/23/12   Page 10 of 22   Document 59

A "false or fraudulent claim" occurs when Medicaid pays for drugs that are not used for an indication that is either approved by the Food, Drug, and Cosmetic Act (FDCA) or supported by a drug compendia. *See, e.g., U.S. ex rel. West v. Ortho-McNeil Pharmaceutical, Inc.,* 2007 WL 2091185, at *2 (N.D. Ill. July 20, 2007) ("Medicaid generally reimburses providers only for 'covered outpatient drugs,'" which "do not include drugs 'used for a medical indication which is not a medically accepted indiction.'")[4] (citing 42 U.S.C. §§ 1396b(i)(10), 1396r-8(a)(3), 1396r-8(k)(3)); *U.S. ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 45 (D. Mass. 2001)); 42 U.S.C. §§ 1396r-8(k)(2),(3), (6) (setting forth the definitions of "covered outpatient drug" and "medically accepted indication"; a "medically accepted indication" is present only when the use is approved by the Food, Drug, and Cosmetic Act (21 U.S.C.A. § 301, et seq.) or any drug compendia (as described in 42 U.S.C. §§ 1396r-8(g)(1)(B)(I))).

With that information in mind, the Court views the required showing to have two elements. The relator must not only show that there was, in fact, a false or fraudulent claim made to Medicaid through the submission of a prescription for a non-approved purpose, but also must show that the defendant knowingly caused that submission to be made. If the relator fails to show *either* of these elements, then his claim must fail.

The Court will examine the "knowingly caused" requirement first. In order to establish that Dr. King-Vassel knowingly caused the submission of

_____

[4]Dr. King-Vassel takes issue with the use of *West*, alleging that the court in that case "expressly acknowledged that physicians can prescribe for off-label uses even though pharmaceutical companies are prohibited from marketing or promoting off-label uses." (King-Vassel/CAPS Reply 13 (citing *West*, 2007 WL 2091185 at *2)).

a false claim, Dr. Watson must establish proof that Dr. King-Vassel acted with "actual knowledge," "deliberate ignorance," or "reckless disregard," of the fact that a claim she caused to be submitted was fraudulent. 31 U.S.C. §§ 3729(a)(1)(A), (b). This requirement, itself, has two separate prongs: a knowledge prong, and a causation prong. That is, it is not enough that Dr. King-Vassel knew that a claim was fraudulent, she must also have knowingly caused the claim to have been made.

When the Court examines those two prongs of the "knowingly caused" requirement, it must conclude that Dr. Watson has not shown "definite, competent evidence to rebut" the summary judgment motion, and therefore the Court will grant Dr. King-Vassel's motion for summary judgment. *See Sears, Roebuck & Co.*, 233 F.3d at 437. Dr. Watson admits that he, himself, is unaware of whether Dr. King-Vassel actually received any reimbursements through Medicaid or would be entitled to reimbursements in the absence of prescribing medication. (King-Vassel/CAPS PFF ¶ 8, and Response). Thus, while he argues that Dr. King-Vassel *should have* known that any prescriptions would have been presented to Medicaid purely as a result of her knowledge that N.B. otherwise used Medicaid services, it is clear that Dr. Watson himself lacks understanding of the reimbursement system, and, therefore, will not be able to establish that Dr. King-Vassel had any knowledge whatsoever of the likelihood of submission of a fraudulent claim. (Relator's Resp. [Docket #45], 3–4). Even if Dr. King-Vassel knew that N.B. received Medicaid, Dr. Watson has not presented any evidence to show that Medicaid would be responsible for covering the cost of N.B.'s prescriptions. He has acknowledged his lack of personal knowledge on the topic, and has also failed to list any expert to provide further testimony. In that way, his

Case 2:11-cv-00236-JPS   Filed 10/23/12   Page 12 of 22   Document 59

failure to name an expert is fatal to his case. The Medicaid reimbursement system is obviously confusing—Dr. Watson himself is not sure of its application to the very person he has sued. Given his personal lack of knowledge of the reimbursement system, Dr. Watson will not be able to testify as to the operation of the reimbursement system and its application to Dr. King-Vassel. And, without that testimony, he will be unable to establish that Dr. King-Vassel had any knowledge (actual or constructive) that N.B.'s claim would be submitted to Medicaid. Because Dr. Watson will not be able to make that showing, there is no way that he will be able to establish the required elements of Medicaid fraud. His failure to show any "definite, competent evidence" to rebut Dr. King-Vassel's motion is fatal to his case, and the Court must grant Dr. King-Vassel's motion for summary judgment. *See Sears, Roebuck & Co.*, 233 F.3d at 437.

Relatedly, without the testimony of an expert, the Court believes that Dr. Watson would be unable to establish causation. Without a doubt, Dr. King-Vassel prescribed N.B. certain medications. But her mere prescription of those medications would not, in and of itself, *cause* the submission of a false claim. Rather, N.B.'s mother would need to submit the claim to a pharmacy at which time she would also need to claim entitlement to Medicaid coverage. Furthermore, the pharmacy would need to check the Medicaid coverage for N.B., ensure the validity of the prescription, fill the prescription, and then submit the claim to Medicaid for reimbursement. And those steps are just the basics that would need to logically occur so that N.B. received his medication and the pharmacy received payment—without testimony of an expert, the Court cannot know what other intervening steps may have occurred between Dr. King-Vassel's signature of the prescription

Case 2:11-cv-00236-JPS   Filed 10/23/12   Page 13 of 22   Document 59

and the submission of a claim to Medicaid. Perhaps more accurately, the Court can describe this as a proximate-cause problem for Dr. Watson. Without an expert to testify, there is a grand mystery between the time of the prescription and the claim being made to Medicaid. In many ways, that mystery is like a black box—perhaps Dr. King-Vassel's signature on the prescription set off a series of reactions that on the other side of the box resulted in a false claim, but the churning mechanism on the inside is still a mystery. Without an expert to explain the workings of the in-between phase (the black box), the Court and an hypothetical jury cannot make any determination of whether Dr. King-Vassel actually caused the submission of a false claim.

Finally, without an expert, Dr. Watson also cannot establish the "fraudulent claim" element required to show a violation of the False Claims Act. *See* 31 U.S.C. § 3729(a)(1)(A). To make the fraudulent claim showing, Dr. Watson would need to establish that Dr. King-Vassel prescribed N.B. medications "for a medical indication which is not a medically accepted indication." *West*, 2007 WL 2091185, at *2. As mentioned above, medically accepted indications must be approved in either the FDCA or one of three drug compendia. *Id.*; 42 U.S.C. §§ 1396r-8(g)(1)(B)(I), (k)(2), (3), (6). Dr. Watson argues that this is an easy showing to satisfy, requiring only a comparison of the FDCA and drug compendia to N.B.'s noted indications. (Relator's Resp. [Docket #42], 7–8). Despite that statement, though, Dr. Watson did not submit any pages of those documents to the Court that would show how easy it would be to make such an identification. And, in reality, medical documents typically are not readily understandable by the general public and would require an expert to explain their application to a

Case 2:11-cv-00236-JPS   Filed 10/23/12   Page 14 of 22   Document 59

particular set of circumstances. *See* Pamela H. Bucy, *The Poor Fit of traditional Evidentiary Doctrine and Sophisticated Crime: An Empirical Analysis of Health Care Fraud Prosecutions*, 63 FORDHAM L. REV. 383, 402–04 (1994) (parties will "need billing experts to guide fact finders through these various applicable regulations…[and] the inapplicability of, or least confusion about, such regulations."). Dr. Watson has not named an expert who could establish the applicability or non-applicability of the drug compendia or FDCA to N.B.'s indications. Therefore, as with the other required showings noted above, Dr. Watson has failed to produce "definite, competent evidence" to rebut Dr. King-Vassel's motion for summary judgment on the issue of fraudulent claim requirement, and the Court must, therefore, grant Dr. King-Vassel's motion. *See Sears, Roebuck & Co.*, 233 F.3d at 437.

Having determined that Dr. Watson has failed to establish ample evidence to support either requirement to succeed in a false claim action, the Court is obliged to grant Dr. King-Vassel's motion for summary judgment and dismiss this action against her.

### 2.2    Sanctions

The only remaining issue is whether to grant Encompass' motion for sanctions against Dr. Watson for Dr. Watson's filing a complaint against Encompass for what Encompass alleges were unsubstantiated claims of *respondeat superior* liability. (Encompass Reply 6–14).

Encompass alleges three separate bases upon which relief could be granted. First, Encompass argues that sanctions are appropriate under Rule 11 of the Federal Rules of Civil Procedure. (Encompass Reply 6–9). Under that rule, the Court may award sanctions if the non-moving party sustained an action without evidentiary support or based on frivolous legal

Case 2:11-cv-00236-JPS   Filed 10/23/12   Page 15 of 22   Document 59

contentions, even after 21 days of being notified by the moving party that it would seek sanctions if the nonmoving party did not dismiss the claim. Fed. R. Civ. P. 11(b)(2), (b)(3), (c)(2). Dr. Watson counters that his voluntary dismissal of Encompass occurred within the 21-day safe harbor period, due to the additional days granted by Rules 5(b)(2)(E) and 6(d) following email service. (Relator's Atty. Fees Resp. 2–3).

The Court agrees that the dismissal occurred within the safe harbor period and, therefore, Rule 11 sanctions are inappropriate.

But, that does not end the Court's sanctions analysis, as Encompass also requests sanctions pursuant to 28 U.S.C. § 1927. Under that provision, sanctions are appropriate where an "attorney…multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927. Under that statute, Dr. Watson's attorney Ms. Gietman could be held liable if the Court determines she unreasonably and vexatiously multiplied the proceedings. Ms. Gietman (in a brief written for Dr. Watson) argues that sanctions are inappropriate under this term because it voluntarily "moved to dismiss the claims against Encompass once it determined that those claims were not likely to succeed." (Relator's Atty. Fees Resp. 4). But the question the Court must ask is not whether Ms. Gietman moved to dismiss the claims when she determined they were unlikely to succeed, but instead whether she acted in an "objectively unreasonable manner" and with a "serious and studied disregard for the orderly process of justice" in waiting to dismiss Encompass until she did. *Jolly Group, Ltd v. Medline Indus., Inc.*, 435 F.3d 717, 720 (7th Cir. 2006) (quoting *Pacific Dunlop Holdings, Inc. v. Barosh*, 22 F.3d 113, 119 (7th Cir. 1994)).

Case 2:11-cv-00236-JPS   Filed 10/23/12   Page 16 of 22   Document 59

Here, the Court is left with the inescapable conclusion that Ms. Gietman acted in an objectively unreasonable manner and with a serious disregard for the order process of justice, and therefore sanctions against her are appropriate. 28 U.S.C. § 1927. As Encompass points out in its brief, its attorney provided Ms. Gietman with a copy of Encompass' contract with Dr. King-Vassel in February of 2012, and explained that under the contract (under which Dr. King-Vassel was an independent contractor) a *respondeat superior* claim could not lie. (Encompass Reply 7–8; Patrick Knight Aff., Ex. 3). Despite that disclosure, Ms. Gietman did not withdraw her claims against Encompass; rather, it was not until nearly six months later, after Encompass was required to participate in the discovery process and prepare and file a summary judgment brief, that those claims were dismissed. At the time of dismissal, there was no additional evidence that would support a *respondeat superior* claim against Encompass—the primary and controlling piece of evidence was the prior-disclosed contract. A reasonable attorney would have attempted to quickly ferret out any information to support a *respondeat superior* claim rather than waiting six months to dismiss such claim. And, while the Court would not suppose that Ms. Gietman should have dropped the claim immediately upon reading the relevant contract, the receipt of such contract should have tipped her off to a serious flaw in the *respondeat superior* claim. She then should have conducted an appropriate investigation into whether there was truly any employment relationship and, barring such relationship, quickly moved to dismiss Encompass. Instead, Encompass was forced to proceed through the entire discovery process and file an extensive summary judgment brief, all to combat a claim that could have been readily dismissed after a minor inquiry based on disclosures made to Ms. Gietman

by Encompass. That is unreasonably vexatious and was based upon Ms. Gietman's serious disregard for the orderly administration of justice. The Court's and Encompass' resources would have been much better spent elsewhere, as opposed to dealing with Dr. Watson's frivolous suit against Encompass. And Ms. Gietman's decision to prolong Encompass' involvement in the matter exposes her to sanctions under 28 U.S.C. § 1927.

Finally, Encompass urges the Court to impose sanctions upon Ms. Gietman and Dr. Watson under *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991). *Chambers* calls for the imposition of sanctions under the court's "inherent powers" to address a full range of litigation abuses by individuals beyond those addressed by 28 U.S.C. § 1927 and Rule 11. *Id.* However, as Dr. Watson points out in his brief, the Court's use of its inherent powers should be limited to situations involving abuse of the judicial process or bad faith. (Relator's Atty Fees Resp. 6); *see also Tucker v. Williams*, 682 F.3d 654, 661–62 (7th Cir. 2012) (citing *Chambers*, 501 U.S. at 55; *Cleveland Hair Clinic, Inc. v. Puig*, 200 F.3d 1063, 1066 (7th Cir. 2000); *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 793 (7th Cir. 2009); *Maynard v. Nygren*, 332 F.3d 462, 470–71 (7th Cir. 2003); *Runfola & Assoc., Inc v. Spectrum II, Inc.*, 88 F.3d 368, 375 (6th Cir. 1996); *Gillette Foods Inc. v. Bayernwald-Fruchteverwertung, GmbH*, 977 F.2d 809, 813–14 (3d Cir. 1992); *Schmude v. Sheahan*, 420 F.3d 645, 650 (7th Cir. 2005); *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co., Inc.*, 313 F.3d 385, 391 (7th Cir. 2002)).

Here, an award of sanctions under the Court's inherent powers is appropriate. In bringing this case to trial, Ms. Gietman and Dr. Watson engaged in conduct that skirted the line of their respective professional responsibilities. As to Dr. Watson, he obtained N.B.'s medical records in a

manner that could best be described as borderline-fraudulent. He obtained a medical release for those records only after representing that he was going to treat N.B.—a total falsity. (*See* King-Vassel/CAPS PFF ¶¶ 11–12). And that does not even touch upon the fishing-expedition style of fact-gathering engaged in by Dr. Watson. His attack here on a single doctor's prescriptions to a single patient does not provide the government with substantial valuable information, as intended by the *qui tam* statutes. Instead of providing the government with valuable information, Dr. Watson seemingly sought only to cash in on a fellow doctor's attempts to best address a patient's needs. In return, Dr. King-Vassel was treated to a lawsuit, the proceeds of which would be split three ways between Dr. Watson, Ms. Gietman, and the parent of the patient Dr. King-Vassel was attempting to serve. As to Ms. Gietman, she should know much better than to have allowed Dr. Watson to obtain medical records in the manner described. The fact that those records were used in deciding whether to bring a case before any court shows a lack of judgment on Ms. Gietman's part—those records were not obtained in an appropriate manner, irrespective of whatever role, if any, Ms. Gietman may have played in the decision of how to obtain them. Dr. Watson's borderline-fraudulent acquisition of the documents, and Ms. Gietman's ommissive failure to stop that action, calls for an award of sanctions against both individuals.

Having determined that an award of sanctions is appropriate against both Ms. Gietman and Dr. Watson, the Court now turns to the appropriate form of such sanctions. First, under 28 U.S.C. § 1927, the Court determines that Ms. Gietman should be monetarily sanctioned. Her failure to timely address Encompass' lack of involvement in this matter caused Encompass to

incur substantial legal fees engaging in depositions and preparing a summary judgment motion. Therefore, the Court believes that she should be required to pay Encompass some amount of money to compensate for those fees wasted in responding to frivolous claims. The Court determines that Ms. Gietman should have determined that Encompass should not be subject to suit prior to Encompass' filing a motion for summary judgment—by the summary judgment phase, it should have been reasonably clear through the exercise of reasonable diligence, that a *respondeat superior* claim would not lie again Encompass. Therefore, the Court will impose upon Ms. Gietman a sanction of reasonable attorney's fees incurred by Encompass in researching, drafting, and filing its brief supporting motion for summary judgment (Docket #34) and its subsequent reply (Docket #52).

Finally, as to the sanctions under the Court's inherent powers, it will require Ms. Gietman and Dr. Watson to pay $500.00 ($250.00 to be paid by each individual) to Dr. King-Vassel and $500.00 ($250.00 to be paid by each individual) to Encompass. Those amounts should be substantial enough to penalize both Ms. Gietman and Dr. Watson for engaging in such unscrupulous tactics to gain access to N.B.'s medical records, while not being so draconian as to impose undue financial hardship upon either individual.

### 3. CONCLUSION

Having fully discussed the entirety of motions and briefs before it in this matter, the Court will now render judgment on each of those motions. In sum, this matter will be dismissed in full (as, after granting Dr. King-Vassel's motion for summary judgment, and otherwise granting Dr. Watson's motions to dismiss CAPS and Encompass, there are no parties left

against which Dr. Watson can sustain a suit). Furthermore, the Court will impose appropriate sanctions upon Ms. Gietman and Dr. Watson.

Accordingly,

**IT IS ORDERED** that Dr. Watson's amended motion to dismiss Encompass (Docket #49) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Dr. Watson's first motion to dismiss Encompass (Docket #40) be and the same is hereby **DENIED as moot**, the Court having already granted Dr. Watson's superseding motion to dismiss Encompass;

**IT IS FURTHER ORDERED** that Encompass' motion for summary judgment and joinder (Docket #33) be and the same is hereby **DENIED as moot**, the Court having already granted Dr. Watson's superseding motion to dismiss Encompass;

**IT IS FURTHER ORDERED** that Dr. Watson's motion to dismiss CAPS (Docket #50) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that CAPS' and Dr. King-Vassel's motion for summary judgment (Docket #28) be and the same is hereby **DENIED in part as moot, as it relates to CAPS**, the Court having already granted Dr. Watson's motion to dismiss CAPS, and **GRANTED in part, as it relates to Dr. King-Vassel**, for the reasons set forth above;

**IT IS FURTHER ORDERED** that Encompass' motion for sanctions (Docket #51) be and the same is hereby **DENIED in part**, as to Encompass' request for sanctions pursuant to Rule 11; and **GRANTED in part**, as to Encompass' request for sanctions pursuant to 28 U.S.C. § 1927, and accordingly Ms. Gietman shall **pay Encompass' reasonable attorneys fees** in preparation of Encompass' brief in support of its motion for summary

Case 2:11-cv-00236-JPS   Filed 10/23/12   Page 21 of 22   Document 59

judgment (Docket #34) and reply brief regarding summary judgment (Docket #51) pursuant to 28 U.S.C. § 1927, and Encompass shall submit documentation of its fees to the Court on or before **November 8, 2012,** and Ms. Gietman shall file any objections thereto on or before **November 29, 2012**; and **GRANTED in part** as to the Court's inherent powers as discussed in *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991) and Ms. Gietman shall further **pay $250.00** to Dr. King-Vassel pursuant to the Court's inherent powers, and Ms. Gietman shall further **pay $250.00** to Encompass pursuant to the Court's inherent powers, and Dr. Watson shall **pay $250.00** to Dr. King-Vassel pursuant to the Court's inherent powers, and Dr. Watson shall further **pay $250.00** to Encompass pursuant to the Court's inherent powers;

IT IS FURTHER ORDERED that CAPS' and Dr. King-Vassel's motion for relief from the scheduling order (Docket #32) be and the same is hereby **DENIED as moot**;

IT IS FURTHER ORDERED that the state of Wisconsin's motion to substitute its attorney (Docket #55) be and the same is hereby **GRANTED**; and

IT IS FURTHER ORDERED that this Court having dismissed all claims against all defendants, this matter be and the same is hereby **DISMISSED** on its merits, together with costs as taxed by the Clerk of Court.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 23rd day of 2012.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge